Adam PELICH, Petitioner–Appellant,

v.

IMMIGRATION and NATURALIZA-
TION SERVICE; Adele J. Fasano,
District Director, for the San Diego
District, Respondents–Appellees.

No. 01–56796.

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 15, 2003.*

Filed May 22, 2003.

Jason I. Ser, Federal Defenders of San
Diego, Inc., San Diego, CA, for the peti-
tioner-appellant.

Patrick K. O'Toole, United States Attor-
ney (when brief was filed), Carol C. Lam,
United States Attorney (when opinion was
filed), Samuel W. Bettwy, Special Assistant
U.S. Attorney, San Diego, CA, for the
respondents-appellees.

Before FRIEDMAN,** KOZINSKI and
RAWLINSON, Circuit Judges.

## OPINION

RAWLINSON, Circuit Judge.

We are aware of the proscription against
indefinite detention articulated in *Zadvy-
das v. Davis*, 533 U.S. 678, 121 S.Ct. 2491,
150 L.Ed.2d 653 (2001). However, Peti-
tioner's detention in this case is indefinite
only because he refuses to cooperate with
the Immigration and Naturalization Ser-
vice's ("INS") efforts to remove him. In
such a circumstance, Petitioner has no
cause to complain; we thus AFFIRM the

---

* This panel unanimously finds this case suit-
able for decision without oral argument. See
Fed. R.App. P. 34(a)(2).

** Daniel M. Friedman, Senior United States
Circuit Judge for the Federal Circuit, sitting
by designation.

district court's denial of Appellant's habeas petition.

## I.

### BACKGROUND

Adam Pelich ("Pelich") was born on January 3, 1957, in Brzeg, Poland. In September 1981, he fled Poland to a refugee camp in Austria. Shortly thereafter, he applied for refugee status in the United States. In that application, he identified himself as a Polish national. The application was approved on March 25, 1982, and Pelich entered the United States as a refugee on April 15, 1982.

On May 12, 1983, Pelich submitted his application for lawful permanent resident status, stating that he was a German national. Pelich also averred that his father was born in Germany, and that he did not know his mother's place of birth. His application reflected his mother's residence as Brzeg, Poland, and that his father was deceased. This application was approved on April 6, 1984, with the INS's record of Pelich's permanent resident status reflecting Polish nationality.

Pelich pled guilty to embezzlement on May 18, 1998, and was sentenced to five years' imprisonment. He was detained by the INS upon completion of his sentence. On October 27, 2000, Pelich was interviewed by an INS deportation officer. During the interview, Pelich told the INS officer that his father was from Israel and his mother was from Monaco. He also gave the officer different names for his parents than those provided on his permanent resident application. On January 3, 2001, Pelich appeared before an Immigration Judge ("IJ"), who ordered Pelich deported to Poland or Germany. Pelich requested deportation to Germany and waived his right to appeal the IJ's order.

Immediately following issuance of the removal order, the INS initiated efforts to obtain travel documents for Pelich from Poland. In the documents sent to Poland, the INS represented that Pelich's parents were born in Poland and that Pelich was a Polish citizen. The Polish consulate responded with a letter dated January 9, 2001. In the letter, the Polish consulate enclosed a passport application to enable the consulate to determine whether Pelich was eligible for Polish travel documents. Pelich has consistently refused to complete the Polish passport application because he is of the view that, given his parents' backgrounds, he is not a Polish citizen.

In August 2001, the INS forwarded a passport application completed by Pelich, along with a formal request for travel documents, to Germany. In that application, Pelich represented that his name was Erich Hans Rothmann, he was of Jewish nationality, and he was born in Potsdam in 1947. Attached to this application was a letter from the INS, representing that Pelich was both a Polish citizen and a German citizen by virtue of his father's birth in Germany. The application was denied without recourse.

Pelich has been in INS custody since November 21, 2000. He petitioned for a writ of habeas corpus, which was denied. Pelich's motion to amend the district court's order was denied on October 3, 2001, and Pelich filed a timely appeal.

## II.

### STANDARD OF REVIEW

■ A district court's denial of a petition for a writ of habeas corpus is reviewed de novo. *See Angulo–Dominguez v. Ashcroft,* 290 F.3d 1147, 1149 (9th Cir.2002).

## III.

### DISCUSSION

A. *Pelich's "Indefinite Detention" Argument*

■ Pelich's petition challenges his ongoing detention by the INS. Ordinarily,

the INS is expected to remove an alien in its custody within ninety days from the issuance of a final removal order. *See* 8 U.S.C. § 1231(a)(1)(A)-(B). An exception to this requirement is provided in 8 U.S.C. § 1231(a)(1)(C), which states:

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

8 U.S.C. § 1231(a)(1)(C). The INS contends that Pelich's detention is authorized by this exception.

■ Pelich counters that his continued detention violates the Supreme Court's ruling in *Zadvydas* as well as this court's ruling in *Ma v. Ashcroft*, 257 F.3d 1095 (9th Cir.2001). *Zadvydas* addressed the plight of two aliens who, through no fault of their own, could not be removed from the United States. *See* 533 U.S. at 684–86, 121 S.Ct. 2491. The aliens in *Zadvydas* were detained by the INS pursuant to 8 U.S.C. § 1231(a)(6),[1] which provides that certain classes of aliens, including those removable due to criminal convictions and those deemed a risk to the community, may be detained beyond the standard ninety-day period. *See id.* at 682, 121 S.Ct. 2491. Due to the aliens' particular circumstances, their detention could have continued for an indefinite period of time.[2] Because the Court concluded that indefinite detention of aliens under these cir-

cumstances "would raise serious constitutional concerns," *id.* at 682, 121 S.Ct. 2491, it construed 8 U.S.C. § 1231(a)(6) to limit an alien's post-removal detention to "a period reasonably necessary to bring about that alien's removal." *Id.* at 689, 121 S.Ct. 2491.

*Zadvydas* places the burden on the alien to show, after a detention period of six months, that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701, 121 S.Ct. 2491. The INS must then introduce evidence to refute that assertion. *See id.; see also Xi v. I.N.S.*, 298 F.3d 832, 839–40 (9th Cir.2002).

■ Although Pelich tries hard, he cannot squeeze his case into the confines of *Zadvydas*. There is significant evidence in the record that, unlike the detainees in *Zadvydas*, Pelich himself is responsible for his plight. Pelich has steadfastly refused to fill out a Polish passport application, which directly impedes Poland's ability to determine whether Pelich qualifies for Polish travel documents. In the January letter, the Polish consulate explicitly reserved its determination of Pelich's citizenship status pending review of the information requested in the letter, including the passport application. Compounding the dilemma is the fact that Pelich has provided the INS with conflicting information regarding his name, his parents' names, his parents' birthplaces and residences, his birthplace and his nationality.

Equally of note is the fact that the provision under which Pelich is being de-

---

1. 8 U.S.C. § 1231(a)(6) provides:
   An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and,

if released, shall be subject to the terms of supervision in paragraph (3).

2. The INS was unsuccessful in its efforts to remove Zadvydas to Germany, Lithuania or the Dominican Republic, with no other viable prospects on the horizon. Ma's continued detention was due to the lack of a repatriation agreement with Cambodia.

tained, 8 U.S.C. § 1231(a)(1)(C). does not present the same constitutional concerns raised by 8 U.S.C. § 1231(a)(6), the provision at issue in *Zadvydas*. The risk of indefinite detention that motivated the Supreme Court's statutory interpretation in *Zadvydas* does not exist when an alien is the cause of his own detention. Unlike the aliens in *Zadvydas*, Pelich has the "keys[to his freedom] in his pocket" and could likely effectuate his removal by providing the information requested by the INS. *See Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir.1999) (finding, pre-*Zadvydas*, that a criminal alien who opted to "postpon[e] the inevitable" by delaying his removal proceeding "has no constitutional right to remain at large during the ensuing delay").

We are further persuaded by the district courts that have addressed this issue and concluded that *Zadvydas* does not save an alien who fails to provide requested documentation to effectuate his removal. The reason is self-evident: the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock.

In *Lema v. I.N.S.*, 214 F.Supp.2d 1116 (W.D.Wash.2002), the district court recognized that " § 1231(a)(1)(C) evidences Congress' intent to permit continued detention when an alien refuses to cooperate and attempts to thwart the INS' efforts to deport him." *Id.* at 1117. Although the court acknowledged a possible "constitutional limit to the amount of time an alien can be detained under [§ 1231(a)(1)(C)]," it elected not to address that issue. *Id.* We pause for a moment to stress that we expressly decline to endorse or reject any inferred *Zadvydas*-inspired limitation to § 1231(a)(1)(C). With that reservation, we agree that a petitioner who impedes INS removal efforts "has not met his burden of showing that there is no significant likelihood of removal in the reasonably foresee-

able future." *Id.* at 1118 (citation and internal quotation marks omitted).

*Powell v. Ashcroft*, 194 F.Supp.2d 209 (E.D.N.Y.2002), involved a petitioner who resorted to tactics similar to those employed by Pelich. Mr. Powell provided a false name, place of birth and date of entry. *Id.* at 210–11. After finding that Mr. Powell's actions "prevent[ed] his removal within the meaning of 8 U.S.C. § 1231(a)(1)(C)," the court concluded that Mr. Powell's "continued detention more than 90 days after his order of removal became final does not entitle him to habeas corpus relief." *Id.* at 211 (citation omitted). The court distinguished *Zadvydas* by observing that "*Zadvydas* addressed the constitutionality of Section 1231(a)(6) in the case of aliens placed in deportation limbo because their countries of origin had refused to allow them entrance. It did not discuss the constitutionality of Section 1231(a)(1)(C) and the tolling of the removal period during the time of an alien's non-cooperation." *Id.* at 212 (citations, internal quotation marks and alteration omitted).

Despite distinguishing *Zadvydas*, the court took pains to note that even if *Zadvydas* applied, Mr. Powell nevertheless was appropriately detained because the INS "produced sufficient evidence to rebut petitioner's claim that there is no reasonable likelihood of deportation in the foreseeable future." *Id.* (internal quotation marks omitted).

Finally, in *Sango–Dema v. INS*, 122 F.Supp.2d 213 (D.Mass.2000), the district court ruled in light of Mr. Sango–Dema's refusal to provide his passport or birth certificate, communicate with embassy officials or complete any of the required application documents. *Id.* at 221. Although the decision preceded *Zadvydas*, it found the corollary predecessor cases inapposite because those "petitioners were placed in deportation limbo because their countries

of origin had refused to allow entrance to the aliens." *Id.* In contrast, Mr. Sango–Dema's indefinite detention, being of his own making, could not trigger "a constitutional right to be free from indefinite detention." *Id.*

It appears that we are the first Court of Appeals to confront the issue whether habeas relief is available when an alien's indefinite detention hinges upon the provisions of § 1231(a)(1)(C). Having surveyed the legal landscape, we have found no authority in conflict with the cases discussed above. We therefore join the existing chorus of courts and hold that an alien cannot assert a viable constitutional claim when his indefinite detention is due to his failure to cooperate with the INS's efforts to remove him.

Since Pelich falls within the category of non-cooperative detainee, he cannot legitimately object to his continued detention when that very detention is caused by his own conduct. Pelich could likely effectuate his own removal (and free himself from detention) by providing the Polish government with the requested information. It naturally follows that his detention is not destined to be indefinite. To the contrary, Pelich's behavior places him within that class of aliens properly detained pursuant to 8 U.S.C. § 1231(a)(1)(C).[3]

### B. *Pelich's "I Am Not A Polish National" Argument*

■ The INS is authorized, pursuant to 8 U.S.C. § 1231(b)(2)(D) to deport an alien to a country of which he is a "subject, national, or citizen." Pelich challenges the INS's authority to deport him to Poland. In essence, he seeks to compel the INS to accept his assertion that he is ineligible for Polish citizenship. The simple answer to Pelich's argument is it's not his place, the INS's or the court's to determine whether Poland would admit him as a citizen. For obvious reasons, the Polish government is in a better—some might say unique—position to make that determination. His argument is thus somewhat premature: Until he provides the proper information, we can only speculate as to the merit of his claim.

In any event, it is eminently reasonable for the INS to believe he is Polish. The record reflects that Pelich was born in Poland, lived there for over twenty years, and reported on his refugee application that he was a Polish national. More importantly, even if Pelich is not a Polish national, he can be deported to the country of his birth or to a country where he resided prior to entering the United States (assuming these countries would take him). *See* 8 U.S.C. § 1231(b)(2)(E).[4] The INS's

---

**3.** If Pelich fills out the application, it's denied and the INS *still* won't let him go, we would have a different case; we'd also have a different case if Pelich, in good faith, fills out the application to the best of his ability, yet the INS (without cause) claims it's not good enough and thus won't submit it to Poland, or tries to force him to include information he maintains is false. We do not have to get into these more challenging questions because the best way to find out whether Pelich is, in fact, Polish, is to send a completed passport application to Poland and see what the Polish authorities say—yet Pelich refuses to cooperate.

**4.** 8 U.S.C. § 1231(b)(2)(E) permits removal to:

(i) The country from which the alien was admitted to the United States.
(ii) The country in which is located the foreign port from which the alien left for the United States. . . .
(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.
(iv) The country in which the alien was born.
(v) The country that had sovereignty over the alien's birthplace when the alien was born.
(vi) The country in which the alien's birthplace is located when the alien is ordered removed.
(vii) . . . [A]nother country whose government will accept the alien into that country.

attempt to remove Pelich to Poland is therefore consistent with § 1231(b)(2)(D) and/or § 1231(b)(2)(E).

## C. *Pelich's "Unclean Hands" Argument*

The doctrine of unclean hands does not obviously apply where it is Pelich, not the INS, who seeks relief. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir.2002) (defining unclean hands as a *defensive* doctrine that bars a party from seeking equitable relief when its conduct is tainted by bad faith). In any event, even if the unclean hands doctrine applies, Pelich's misinformation points a finger right back at him.

## IV.

### *CONCLUSION*

Pelich's petition for a writ of habeas corpus relied heavily on the rationale set forth by the Supreme Court in *Zadvydas*. However, the same concerns regarding indefinite detention do not arise where the length of detention is in direct proportion to the detainee's recalcitrant refusal to cooperate in effectuating his removal. In such a circumstance, the alien's detention triggers no constitutional concerns.

AFFIRMED.